# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

HEATHER M. ACORD, )
)
        Plaintiff, )
)
v. ) No. 05-0540-CV-W-FJG
)
METROPOLITAN LIFE INSURANCE )
COMPANY, )
)
        Defendant. )

## ORDER

Pending before the Court are (1) Plaintiff's Motion for Summary Judgment (Doc. No. 15); and (2) Defendant's Motion for Summary Judgment (Doc. No. 17).

**I. Facts.**[1]

Plaintiff Heather M. Acord brought this action, pursuant to 29 U.S.C. § 1132, for short term disability ("STD") benefits under an employee welfare benefit plan[2]. Complaint ¶ 1; Answer, ¶ 1. Plaintiff is a female born on November 27, 1975. (See plaintiff's statement of facts (Doc. No. 16), ¶ 3; A.R. 156.) Plaintiff was an employee of Citigroup or a subsidiary ("Citi") and applied for STD benefits under the Citigroup Salary Continuation

---

[1]Plaintiff did not file a response to defendant's motion for summary judgment, and thus did not specifically controvert any of the facts presented in the motion and suggestions in support. In accordance with Local Rule 56.1(a), "[a]ll facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the opposing party." See Ruby v. Springfield R-12 Public School Dist., 76 F.3d 909, 911 n. 6 (8th Cir. 1996). Accordingly, all facts set forth in the Court's statement of facts will be taken from defendant's motion for summary judgment (Doc. No. 17) and defendant's suggestions in support (Doc. No. 18) unless otherwise specified.

[2]A copy of the Summary Plan Description explaining the benefits of the Citigroup Salary Continuation (Short Term Disability) Plan (the "Plan") was filed with Doc. No. 18 as Documents ML00001 through ML00016 of Exhibit 1 to the Affidavit of Laura Sullivan, Exhibit A.

(Short Term Disability Plan) (the "Plan") coverage provided by her employer. (See plaintiff's statement of facts (Doc. No. 16), ¶ 1.) The Plan is self-funded by Citigroup, Inc., and MetLife is the Claims Administrator. See Summary Plan Description, A.R. 7, 15[3]. The Plan grants MetLife, as Claims Administrator, discretionary authority, by providing:

> Under the terms of the Plan, the Claims Administrator is the named fiduciary for adjudicating claims for benefits under the Plan, and for deciding any appeals of denied claims. The Claims Administrator shall have the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Claims Administrator shall be final and binding on participants and beneficiaries to the fullest extent permitted by law.

A.R. 13.

MetLife received Plaintiff Heather M. Acord's claim for STD benefits on October 7, 2004. A.R. 17-21. MetLife contacted plaintiff's supervisor and verified plaintiff's job title as Probate Specialist and her job description as taking inbound calls in the Probate Department of CitiCards West, working 8:00 a.m. through 4:30 p.m. Monday through Friday. A.R. 21. Plaintiff's last day worked prior to making her STD claim was October 1, 2004. A.R. 21. On October 8, 2004, MetLife contacted the office of plaintiff's attending physician, Dr. Moreng, to obtain plaintiff's medical records, and was advised that a medical release was needed. A.R. 22. MetLife left a message for plaintiff on October 8, 2004 that Dr. Moreng indicated a release was needed and requested that plaintiff follow up with his office. A.R. 22. On October 13, 2004, MetLife attempted to contact Dr. Moreng for an interview and was told by his office to fax a release. MetLife had not received a release at that time. A.R. 22.

On or about October 14, 2004, MetLife received a medical questionnaire that was

---

[3]The administrative record in this matter has been submitted as Documents ML00001 through ML00160 of Exhibit 1 to the Affidavit of Laura Sullivan, filed as Exhibit A to Doc. No. 18. All references to the administrative record in this Order will be noted through the abbreviation "A.R."

completed in part by Dr. Moreng. A.R. 152-153. In response to the questionnaire, Dr. Moreng stated that: plaintiff's primary diagnosis was tension headache; her secondary diagnosis was neck pain; she was initially seen on October 7, 2004, which was also the last date seen and the date she was advised to cease work; and the date of next appointment was "pending." Dr. Moreng stated that lab testing was "normal" and that other recommended testing (lab work, sleep study, EEG) was pending. He described the signs and symptoms preventing plaintiff from working as "upper neck/occiput headache" and stated that the treatment plan was "review testing results – determine treatment after that time." Medications were Tylenol No. 3 prn, prenatal vitamins and Zoloft. Although the questionnaire asked the plaintiff's physical capacities, Dr. Moreng did not fill in that portion of the questionnaire, but wrote "patient not assessed for functional capabilities." A.R. 152-153. Asked whether plaintiff was able to return to work with restrictions or part-time, and if yes, to list the restrictions, work hours, capabilities, return-to-work date and duration of restrictions, Dr. Moreng stated, "unable to determine until testing completed pending patient's insurance approval." For the estimated return-to-work date, Dr. Moreng stated, "unknown until testing completed – pending patient insurance approval." A.R. 153.

MetLife attempted to contact plaintiff's primary care physician, Dr. Krumm, and plaintiff's obstetrician, Dr. Riojas, on October 15, 2004. Dr. Riojas' office was closed, and a voice mail message was left at Dr. Krumm's office. A.R. 24. On October 18, 2004, Dr. Krumm's office advised that a signed release was needed and that Dr. Krumm would be out of the office after that day until October 25, 2004. A.R. 25. MetLife faxed a request to Dr. Krumm's office for office notes after October 4, faxed a blank authorization and contacted plaintiff, suggesting that plaintiff follow up with Dr. Krumm's office. A.R. 25. On October 21, 2004, plaintiff advised MetLife that Dr. Krumm, her primary care physician, had referred her to Dr. Moreng, the neurologist, and that Dr. Moreng was the physician that asked plaintiff to remain out of work. A.R. 25.

3

The Plan defines Disability as follows:

**Definition of Total Disability**

Disabled or Disability means that, due to sickness, pregnancy, or accidental injury, you are:

* receiving appropriate care and treatment from a doctor on a continuing basis; and

* medically unable to perform the essential duties of your own occupation for any employer because of a physical or mental impairment.

You are not considered to have a disability if your illness, injury, or pregnancy only prevents you from commuting to and from work.

**Effective January 1, 2004:** Total Disability means that due to a serious health condition, pregnancy, or injury, you are unable to perform the essential duties of your regular occupation for more than seven consecutive calendar days.

You are not considered to have a disability if your illness, injury, or pregnancy only prevents you from commuting to and from work.

The elimination period is seven calendar days. Beginning the day after you satisfy the elimination period, salary continuation, if eligible and approved, will commence retroactive to your first scheduled work day. To qualify, you must be receiving appropriate care and treatment from a licensed health care provider on a continuing basis.

A.R. 4.

MetLife denied plaintiff's claim for STD benefits and so advised plaintiff by letter dated October 26, 2004, stating in part:

The physician's questionnaire from Dr. Moreng dated 10/14/04 stated that you were advised out of work as of 10/7/04 and were diagnosed with tension headaches and neck pain. It is noted that you had been hospitalized, however, there was no information regarding what dates you were in the hospital. Your lab testing results were listed as normal and you had an EEG and sleep study results were pending. Your symptoms were listed as upper neck and occiptal [sic] headaches. Your treatment plan was for Dr. Moreng to review your treatment results and develop a treatment plan. You were prescribed Tylenol 3, vitamins and Zoloft. Your physical capabilities were not

4

> completed by Dr. Moreng.
>
> Additionally, a physicians [sic] questionnaire was faxed to Dr. Krum, but no response was received.
>
> While we do not dispute that you have a diagnosis of a [sic] tension headaches and neck pain, the available medical information does not indicate symptoms of sufficient severity as to preclude you from performing the essential functions of your sedentary job duties as a Probate Specialist. Therefore, your claim has been denied.

Plaintiff was advised of her right to appeal. A.R. 136-137.

On or about October 27, 2004, MetLife received a copy of a report from Dr. Moreng to Dr. Krumm. A.R. 26, A.R. 80-83. Dr. Moreng noted that plaintiff was 28 years-old and 14 weeks pregnant, that the child's father did not express willingness to accept any responsibilities associated with the pregnancy or future childcare, that plaintiff lived alone and that she described her work as very stressful. The report stated in part:

> She complains of headaches which began approximately three weeks ago. During the initial two weeks, she notes that headaches began approximately halfway through the workday and began to recede slowly within an hour or so after returning home from work. The headaches took several hours to develop and several more to recede but were usually gone by bedtime. The frequency was Monday through Friday and gone on weekends. She tried Tylenol without benefit. She notes the pain developed as "squeezing" over her upper neck/occiput, more on the right. Throughout this past week, she noted a "twinge" of headache beginning on Sunday evening. She notes development of pain in a similar location taking several days to peak intensity which happened on Tuesday. She obtained Tylenol #3 on Wednesday, which began to help within 45-60 minutes. She has not been back to work this week. She is currently pain-free. She notes that at peak intensity, she develops sensitivity to light, noise and became nauseated, but she did not vomit.
>
> She notes that since her pregnancy she is less adept at handling stress than before.

A.R. 80-81. The report also noted that plaintiff snored and felt excessive sleepiness during the day. Dr. Moreng's impression was: headaches and neck pain, suspected to be related to muscle contraction; significant life stressors; pregnant; normal neurological examination;

5

excessive daytime sleepiness; and body habitus suggesting predisposition to obstructive sleep apnea. His plan was lab testing to evaluate for potential contributing systemic etiologies, physical therapy evaluation and treatment for muscle contraction/exercises, a psychological evaluation exploring possible stress-reduction techniques, a sleep study, and appointment to a headache clinic. A.R. 82-83.

On October 27, 2004, a revised Physician Questionnaire was submitted to MetLife by Dr. Moreng. A.R. 139-140. The Physician Questionnaire lists the primary diagnosis as "tension headache" and the secondary diagnosis as "neck pain, excessive daytime sleepiness." It listed signs and symptoms preventing from working as "Upper neck/occiput headache – patient is also pregnant – approx 17 weeks gestation." In response to the question whether the employee was able to return to work with restrictions or part time, Dr. Moreng stated "unable to determine until testing completed – sleep study scheduled for 11-2-04 at 2000 (8 o'clock p.m.)." For the estimated return to work date, Dr. Moreng stated "unknown until testing completed –- pending patient insurance approval." Although the Questionnaire asked the plaintiff's physical capabilities, that portion of the form was not completed. Handwritten notes in that portion of the form stated "Patient not assessed for functional capabilities. See progress note dated 10-7-04." A.R. 139-140.

MetLife's diary notes reflect a review by a MetLife Nurse Consultant on November 4, 2004. The Nurse Consultant noted that there was no indication as to why plaintiff was unable to perform her job, and the headaches seemed to be job related and not disabling. It was also noted that when plaintiff took Tylenol 3 she was relieved of symptoms within an hour. A.R. 27-29.

On or about November 5, 2004, Yolanda Torres, LPN of Dr. Moreng's office faxed a note, stating in part:

> The patient was seen in our office on October 7, 2004 due to severe headaches. Ms. Acord is unable to perform any job duties due to her severe headaches. At this point, we are unable to determine what may be causing her head pain.

6

> An MRI of the brain and/or cervical spine is often recommended for our headache patients as a diagnostic tool, but because the patient is pregnant and she complained of excessive daytime sleepiness, a sleep study was scheduled. The sleep study was performed November 2, 2004. We are investigating for possible obstructive sleep apnea, among other disorders which may be the culprit for her headaches. If the sleep study is abnormal, the patient may be treated with a CPAP machine. It usually takes 2 weeks for the results of the sleep study to be available. If the study is abnormal, Ms. Acord may begin CPAP therapy. She will follow up with our sleep medicine physician at least 4-6 weeks after treatment is initiated.

A.R. 77.

Nurse Torres faxed an additional note, dated November 15, 2004 to MetLife, stating in part:

> Miss Acord is being seen in our office for severe headaches. As stated in physician's progress notes dated 10/07/04, the patient states she has headaches five days a week. Miss Acord also stated that pain begins as a "squeezing" sensation which develops over her upper neck/occipital areas, more on the right. On a pain scale of 1-10 intensity is an 8 when headache is at its worst. The pain affects the patient's activities of daily living where she needs to lie down. Miss Acord, at these times, develops sensitivity to light, noise and becomes nauseated.

A.R. 79.

On November 17, 2004, MetLife received plaintiff's appeal, dated November 16, 2004. A.R. 124-126. In this letter, among other things, plaintiff reports the following: (1) daily severe headaches, the symptoms of which include sensitivity to light, constant pressure, and neck and shoulder pain; (2) her pregnancy has prevented her from taking anything other than Tylenol, which "has not worked at all"; (3) her pregnancy has prevented doctors "from being able to perform normal tests to determine the cause of the headaches such as a catscan or MRI"; (4) "When the headaches began in early October, the pain would start approximately half way through my workday, become worse as the day went along and not subside until late in the evening. I would then go back to work the next day and it starts all over again. However, the headaches only happened Monday thru Friday";

7

and (5) "Once the headache began, my productivity, sharpness and overall ability to do my job ceased." A.R. 125-126.

On or about December 20, 2004, MetLife received from Dr. Moreng's office a copy of a sleep study report by Vernon D. Rowe, M.D. A.R. 111. His interpretation was:

> Upper Airway Resistance Syndrome was present with a markedly elevated arousal index. Period Limb Movement Disorder (781.0) was also observed. A repeat polysomnogram with CPAP is recommended to improve this patient's overall sleep quality and maintain a patent airway.

A.R. 111. Further, the report found sleep efficiency recorded at 77%, and a total of 476 arousal/awakenings, yielding an elevated arousal index of 71 per hour. Id.

The sleep study report was reviewed by a MetLife Nurse Consultant, who concluded that it did not support plaintiff's STD claim, as there were no significant findings that would indicate plaintiff was disabled and unable to work. A.R. 39-40.

MetLife referred plaintiff's file to an Independent Physician Consultant, Tracey Schmidt, M.D. A.R. 93. Dr. Schmidt, who is Board Certified in Internal Medicine and Rheumatology, reviewed plaintiff's medical records, noted "Claimant out of work from a sedentary position with complaints of daytime sleepiness and headache/neck pain since 10/4/04," and concluded:

> File lacks sufficient medical to support objective evidence of a physical functional capacity impairment to a full-time time [sic] sedentary position from 10/4/04 onward. Claimant has reports of headache/neck pain with reports of daytime sleepiness. File contains only one visit to the Mid American Neuroscience Institute for entire claim on 10/7/04. She was seen on 10/7/04 and it was reported that she had a normal neurologic exam. It was felt her headaches/neck pain was related to muscle contractions and that she had significant life stressors. It was suggested that claimant go to physical therapy but file lacks any notes for this provider. It was suggested that claimant has a psychological evaluation with Dr. Feaster, exploring possible stress reduction techniques but file lacks any notes from this provider. File lacked any mention of diminished ROM/spasm of the neck on exam. File lacks mention of specific ADL impairment by her health care provider or need for home health aide that would support an impairment from a sedentary position. She was pain free at the 10/7/04 visit and it was reported that her pain was improved with Tylenol #3, which she obtained on Wednesday.

> Claimant has reports of daytime sleepiness and is presently on Zoloft. It is not clear from the file why claimant is taking Zoloft and who is prescribing this. Sleep studies only reported an RDI of 2 per hour but reported Upper Airway Ristance Syndrome with a markedly elevated arousal index. Periodic Limb Movement Disorder was also observed. It was suggested she have a repeat sleep study with CPAP but file lacks this repeat study. There was no indication in the file that she was started on CPAP. Tricyclic antidepressants can cause a secondary form of PLMD. File lacks any multiple sleep latency testing, which is the gold standard to objectively document daytime sleepiness. File lacks any abnormal mental status exam findings to support any cognitive changes with her subjective complaints of daytime sleepiness. File lacks mention by her provider of restrictions on driving because of daytime sleepiness.

(A.R. 91).

With respect to Dr. Schmidt's report, plaintiff states that the doctor apparently was not provided the entire report of MidAmerica Neuroscience Institute as Dr. Schmidt states "? Provider as page missing." A.R. 90. Plaintiff further notes that Dr. Schmidt does not reference the statements plaintiff made in her letters to defendant.

MetLife upheld its denial of plaintiff's claim and so advised plaintiff by letter dated January 31, 2005 (A.R. 94, A.R. 96), stating in part:

> Lab results were normal. A sleep study showed upper airway resistance syndrome with a markedly elevated arousal index. A repeat sleep study wit [sic] CPAP was recommended.
>
> The neurological examination conducted on October 4, 2004 was normal. A neurological examination conducted on October 7, 2004 was normal. There were recommendations for physical therapy and a psychological evaluation, however, there is no indication in the claim file that any therapy or evaluation was performed. Although the sleep study results did show an abnormality, there is no indication that any multiple sleep latency tests, to objectively document daytime sleepiness, were performed. The medical information in the claim file does not document any cognitive impairments, such as impaired concentration, impaired ability to focus, impaired ability to communicate or impaired thought processes.
>
> Although the medical information in the claim file documents subjective complaints of headaches and excessive daytime sleepiness, it does not document functional limitations that have prevented you from performing the essential duties of your occupation. Therefore, the original claim

9

determination was appropriate.

(A.R. 96).

## II. Summary Judgment Standard.

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence, must set forth facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. Lower Brule, 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. Id. Rather, "the disputes must be outcome determinative under prevailing law." Id. (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts." Matsushita, 475 U.S. at 586. Demanding more than a metaphysical doubt respects the appropriate role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."

10

Celotex, 477 U.S. at 327.

**III. ERISA Standard of Review**

A court reviewing an ERISA plan administrator's decision denying benefits should apply a de novo standard of review unless the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms. Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If a plan gives the administrator discretionary authority, then a court should review a plan administrator's decision only for abuse of discretion. Id. at 115; Cox v. Mid-America Dairymen, Inc., 965 F.2d 569, 571 (8th Cir. 1992), aff'd after remand, 13 F.3d 272 (8th Cir. 1993). The Plan at issue in this case provides discretionary authority to the Plan Administrator to interpret the plan terms; therefore, the Court will apply the abuse-of-discretion standard.

Under the abuse-of-discretion standard, a court applies a deferential standard of review to an administrator's plan interpretation and fact-based eligibility determinations. See Donaho v. FMC Corporation, 74 F.3d 894, 898 (8th Cir. 1996) (abrogated on other grounds by Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003)). The deferential standard does not allow a reviewing court to reject an administrator's discretionary decision simply because the court disagrees. Id. The proper inquiry is "whether the plan administrator's decision was reasonable; i.e., supported by substantial evidence." Donaho, 74 F.3d at 899. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." McGee v. Reliance Standard Life Ins. Co., 360 F.3d 921, 924 (8th Cir. 2004). A court will affirm an administrator's reasonable interpretation of a plan. Cox v. Mid-America Dairymen, Inc., 13 F.3d 272, 274 (8th Cir. 1993); Finley v. Special Agents Mut. Benefit Ass'n, Inc., 957 F.2d 617, 621 (8th Cir. 1992).

To properly apply the deferential standard of review, "a reviewing court must be provided the rationale underlying the trustee's discretionary decision." Cox, 965 F.2d at 574. A court's decision as to whether a plan administrator abused his or her discretion

11

must be based on facts known to the administrator at the time the benefits claim decision was made. Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 641 (8th Cir. 1997); Collins v. Central States, Southeast and Southwest Areas Health & Welfare Fund, 18 F.3d 556, 560 (8th Cir. 1994). When applying the arbitrary and capricious standard of review, the Court only considers evidence that is part of the administrative record. See Barnhart v. UNUM Life Ins. Co. of America, 179 F.3d 583, 590 (8th Cir. 1999); Layes v. Mead Corp., 132 F.3d 1246, 1251 (8th Cir. 1998). The court cannot substitute its own weighing of the conflicting evidence for that of the plan administrator. Cash, 107 F.3d at 641; Cox, 965 F.2d 569, 573 (8th Cir. 1992).

**IV. Discussion.**

    A.    Plaintiff's Motion for Summary Judgment (Doc. No. 15)

Plaintiff makes three arguments in support of her motion for summary judgment. First, plaintiff argues that defendant has "fabricated" a Plan requirement that does not exist, and "made up" a reason to deny her claim without any basis in the Plan. Plaintiff states, "Nothing in the Plan states the claimant has to have or provide 'clinical documentation' or to 'objectively document' every condition," even though those were the reasons given by defendant in its final denial letter of January 31, 2005. A.R. 94-96. Instead, plaintiff argues that she received "appropriate care and treatment from a doctor on a continuing basis and was medically unable to perform the essential duties of her own occupation for any employer, which is all the Plan requires." See A.R. 4. Plaintiff states that it was arbitrary and capricious for defendant to impose a standard not required by the plan provisions.

Defendant responds, and this Court agrees, that plaintiff's argument is directly contrary to Eighth Circuit decisions. "It is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence." McGee v. Reliance Standard Life Ins. Co., 360 F.3d 921, 925 (8th Cir. 2004). See also Coker v. Metropolitan Life Ins. Co., 281 F.3d 793, 799-800 (8th Cir. 2002) (same); Hunt v. Metropolitan Life Ins. Co., 425 F.3d 489,

12

491 (8th Cir. 2005) (same); Pralutsky v. Metropolitan Life Ins. Co., 435 F.3d 833, 841 (8th Cir. 2006) (same).  If this Court were to decide that the plan administrator was precluded from asking for objective evidence in a situation such as the one presented in this matter (where plaintiff's support for her claim is primarily her own subjective complaints), the plan administrator would have significant difficulty in meeting its "obligation to protect the plan's trust property by ensuring that disability claims are substantiated." See Pralutsky, 435 F.3d at 841. The Court cannot grant plaintiff's motion for summary judgment based on this point.

Second, plaintiff claims MetLife failed to provide the entire MidAmerica Neuroscience Institute report to the reviewing physician, Dr. Schmidt.  In Dr. Schmidt's review, Dr. Schmidt notes "10/7/04 – MedAmerica Neuroscience Institute - ? Provider as page missing."  (A.R. 90).  Plaintiff states that it is unknown what was missing.  Plaintiff further argues that she is entitled to a full and fair review of her claim, and that means "not withholding medical records from any reviewing doctor of the claim administrator."

Defendant counters that there is no support for the claim that it "withheld" medical records.  Defendant further notes that Dr. Schmit's discussion of Dr. Moreng's October 7, 2004 report concludes with a reference to a possible psychological evaluation by Dr. Feaster, which is the last statement on page 3 of the report (A.R. 88).  Defendant states this suggests that Dr. Schmidt may not have had the signature page of the report, which includes the following statements besides the signature:

> 4.  Sleep study to find out if she does indeed have sleep disordered breathing, which if present and remedied, may markedly improve the way that she feels.
>
> 5.  Appointment to headache clinic.
>
> I appreciate the opportunity of consulting in this pleasant and interesting patient's care.

(A.R. 89). Later in her report, Dr. Schmidt discussed the referral to the sleep clinic and the sleep study that had been conducted on plaintiff.  Further, plaintiff's medical records do not

13

indicate she ever consulted anyone at the headache clinic. The Court agrees with defendant that the page missing from the information given to Dr. Schmidt has no real effect on the outcome of this matter; a review of Dr. Schmidt's report demonstrates a full consideration of the evidence in the administrative record.

Third, plaintiff argues that MetLife failed to secure a complete description of plaintiff's job. Plaintiff notes that the claim administrator states, in the January 31, 2005 final denial letter, "Although the medical information in the claim file documents subjective complaints of headaches and excessive daytime sleepiness, it does not document functional limitations that have prevented you from performing the essential duties of your occupation." A.R. 96. Plaintiff argues that, based on the administrative record, there is no information as to the essential duties of the plaintiff's occupation; for instance, plaintiff argues there is no information as to productivity requirements, computer knowledge, and office procedures. Instead, plaintiff states that the initial claim stage it was reported that plaintiff "takes incoming calls in the probate department." A.R. 21. Plaintiff argues that it was defendant's burden to secure a more complete job description.[4]

Defendant responds that the taking of inbound phone calls in a probate or collection department or call center is not unusual enough to require that the claims administrator obtain additional information. Further, defendant states that the medical information in the claim file did not document any cognitive impairments, such as impaired concentration, impaired ability to focus, impaired ability to communicate or impaired thought processes.

---

[4]For this proposition, plaintiff cites Perlman v. Swiss Bank Corp. Disability Protection Plan, 979 F.Supp. 729, 730 (N.D. Ill. 1997), wherein the district court found the denial of disability benefits to be arbitrary and capricious when all the plan administrator knew was that the claimant was a lawyer, and the plan administrator failed to gather additional information about the plaintiff's job responsibilities. However, the case cited by plaintiff is no longer good law. Instead, the Seventh Circuit vacated the lower court's opinion, and found that the administrator was not arbitrary or capricious in denying benefits. See Perlman v. Swiss Bank Corp. Disability Protection Plan, 195 F.3d 975 (7th Cir. 1999).

Case 4:05-cv-00540-FJG   Document 22   Filed 08/21/06   Page 14 of 16

(A.R. 96). Additionally, plaintiff's treating physician did not provide any information regarding plaintiff's functional capacity. Defendant states that any additional information regard plaintiff's job duties would have had no impact on the benefit determination.

This Court agrees with defendant's position and finds that it was not required to obtain more detailed information regarding plaintiff's job description, as such further information would have had no impact on the benefit decision.

For the foregoing reasons, plaintiff's motion for summary judgment (Doc. No. 15) is **DENIED.**

B.  Defendant's Motion for Summary Judgment (Doc. No. 17)

Defendant argues that its denial was supported by substantial evidence, in that the record did not show that plaintiff met the Plan definition of Total Disability. Defendant reiterates the facts surrounding the denial of plaintiff's claim; however, those facts were not controverted by plaintiff and are detailed in this Order's statement of facts, and need not be repeated here. In short, plaintiff provided little medical evidence regarding her condition, and her doctor did not opine that she was disabled or had functional limitations.

As discussed above, Dr. Tracey Schmidt, the independent medical consultant who reviewed plaintiff's claim, concluded that plaintiff's file "lacks sufficient medical to support objective evidence of a physical functional capacity impairment to a full-time sedentary position from 10/4/04 onward." (A.R. 91). In Coker v. Metropolitan Life Ins. Co., 281 F.3d 793, 799 (8th Cir. 2002):

> Where there is a conflict of opinion between claimant's treating physician and the plan administrator's reviewing physicians, the plan administrator has discretion to find that the employee is not disabled unless "the administrative decision lacks support in the record, or . . . the evidence in support of the decision does not ring true and is . . . overwhelmed by contrary evidence."

(quoting Donaho v. FMC Corp., 74 F.3d at 901). Here, Dr. Schmidt's opinion was supported by the record, and was not "overwhelmed by contrary evidence." Plaintiff's doctor did not state that plaintiff was unable to work; instead, the only medical opinion that

15

plaintiff was unable to work came from Nurse Torres, and this Court agrees with defendant that her conclusion was not supported by plaintiff's medical records.

Therefore, as the administrative record demonstrates that defendant's decision was reasonable, was supported by substantial evidence on the record, and was not an abuse of discretion, defendant's motion for summary judgment (Doc. No. 17) is **GRANTED.**

## V. Conclusion

For the reasons set forth above, (1) plaintiff's motion for summary judgment (Doc. No. 15) is **DENIED**; and (2) defendant's motion for summary judgment (Doc. No. 17) is **GRANTED.**

**IT IS SO ORDERED.**

Date: August 21, 2006  
Kansas City, Missouri

S/ FERNANDO J. GAITAN, JR.  
Fernando J. Gaitan, Jr.  
United States District Judge